**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

ROBERT PATTERSON,         )
                            )
            Plaintiff,     )
                            )
            v.             )      1:24cv399
                            )
CITY OF GRAHAM, et al.,     )
                            )
            Defendants.    )

## MEMORANDUM OPINION AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendants' Motion to Dismiss the Amended Complaint" (Docket Entry 16) (the "Motion") filed by the City of Graham (the "City"), Jason Moore (at times, "Capt. Moore"), Tommy Cole (at times, "Chief Cole"), and Megan Garner (individually, "City Manager Garner," and collectively with the City, Moore, and Cole, the "Defendants"). For the reasons that follow, the Court should grant the Motion.

## BACKGROUND

Asserting various violations of his rights during his employment with the City of Graham (the "City"), Robert Patterson (the "Plaintiff") filed a verified complaint against the City and three of its employees, whom he sued in both their individual and official capacities. (See generally Docket Entry 1 (the

"Complaint") at 1-16.)[1]  In particular, the Complaint asserts that Defendants violated Plaintiff's rights under 42 U.S.C. § 1983 ("Section 1983"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq., (the "ADEA"), the antiretaliation provisions of Title VII of the Civil Rights Act of 1964 ("Title VII"), North Carolina public policy, and his employment contract with the City.  (See id.)[2]  Defendants moved to dismiss the

_____

1  Docket Entry page citations utilize the CM/ECF footer's pagination.

2  The parties' filings presume that North Carolina law governs Plaintiff's state law claims. (See, e.g., Docket Entry 17 at 17-22 (discussing North Carolina law in seeking dismissal of state law claims); Docket Entry 19 at 14-20 (discussing North Carolina law in opposing dismissal of state law claims).)  "A federal court . . . exercising supplemental jurisdiction over state law claims must apply the substantive law of the forum state, including the for[u]m state's choice of law rules." Hill v. AQ Textiles LLC, 582 F. Supp. 3d 297, 318 (M.D.N.C. 2022).  "North Carolina courts follow the First Restatement of Conflict of Laws in actions sounding in tort and apply the tort law of the state where the injury occurred." Id. (citing, inter alia, SciGrip, Inc. v. Osae, 373 N.C. 409, 420, 838 S.E.2d 334, 343 (2020)).  As to contractual claims, North Carolina law provides "that the interpretation of a contract is governed by the law of the place where the contract was made." Tanglewood Land Co., Inc. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980).  Accordingly, the Court (like the parties) should look to North Carolina law to resolve Plaintiff's state law claims, as the facts alleged in the Amended Complaint indicate that he suffered any tortious injury at Defendants' hands in North Carolina and made any contract with the City in North Carolina (see Docket Entry 12 at 1-16 (setting out "Factual Allegations" and asserting claims (all-cap, bold, and underscored font omitted))).  In so doing, although "[t]he highest court of the state is the final arbiter of what is state law," West v. American Tel. & Tel. Co., 311 U.S. 233, 236 (1940), "[b]ecause North Carolina currently has no mechanism for [federal courts] to certify questions of state law to its Supreme Court, . . . [the Court] must follow the decision of an intermediate state appellate (continued...)

Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules"), "for failure to state a claim upon which relief may be granted." (Docket Entry 8 at 1.) More specifically, Defendants urged dismissal of Plaintiff's claims on the grounds that, inter alia, (i) the ADEA preempts Plaintiff's Section 1983 claim (Docket Entry 9 at 5); (ii) the Complaint does not state a plausible ADEA claim both because its allegations qualify as speculative and because it alleges a nondiscriminatory reason for Plaintiff's termination (id. at 8); (iii) the Complaint does not plausibly allege that Plaintiff engaged in protected activity (see id. at 10) or that any such activity caused Plaintiff's non-promotion and termination (see id. at 11-12), precluding any retaliation claim (see id. at 9, 12); (iv) the hostile work environment claim fails as untimely (see id. at 13) and lacks necessary factual allegations (see id. at 14-15); (v) the state law wrongful termination claim cannot proceed because Plaintiff's federal discrimination claims fall short (see id. at 16); (vi) the Complaint's breach of contract claims falter as a result of Plaintiff's at-will-employee status during his employment with the City (see id. at 17, 20); (vii) the Complaint's tortious interference claims against Moore, Cole, and City Manager Garner

_____

2(...continued)
court unless there is persuasive data that the highest court would decide differently," Town of Nags Head v. Toloczko, 728 F.3d 391, 398 (4th Cir. 2013) (internal quotation marks omitted).

(collectively, the "Individual Defendants") fail given Individual Defendants' non-outsider status and the lack of any allegations of legal malice (see id. at 17-18); and (viii) Plaintiff's official-capacity claims against Individual Defendants simply duplicate his claims against the City (see id. at 21-22).

Plaintiff responded to Defendant's initial motion to dismiss by revising his complaint. (See Docket Entry 12 (the "Amended Complaint") at 1-19.) The Amended Complaint, which Plaintiff likewise verified (see id. at 19), largely mirrors the Complaint, differing primarily in allegations related to the fallout from the cessation of Plaintiff's affair with Courtney Wrenn ("Mrs. Wrenn"), a married woman. (Compare Docket Entry 1, with Docket Entry 12.) In particular, the Amended Complaint corrects an apparent typographical error regarding the nature of the charge that Plaintiff submitted to the Equal Employment Opportunity Commission (the "EEOC") on May 16, 2023. (Compare Docket Entry 1, ¶ 10 (asserting that "Plaintiff timely submitted a charge of employment discrimination on the basis of race and retaliation to [the EEOC]" (emphasis added)), with Docket Entry 12, ¶ 10 (asserting that "Plaintiff timely submitted a charge of employment discrimination on the basis of age and retaliation to the [EEOC]" (emphasis added)).) The Amended Complaint also adds allegations regarding a request from Chief Cole for Plaintiff to serve as a bridge between leadership and other firefighters (see Docket Entry 12, ¶¶ 21-22)

4

and asserts that Plaintiff executed a contract when he commenced employment with the City in 1994 (see id., ¶ 98), in connection with which the Amended Complaint expands its breach of contract claim (compare id. at 14 (asserting claim for "breach of express and implied contract" (all-cap, bold, and underscored font omitted)), with Docket Entry 1 at 13 (asserting claim for "breach of implied contract" (all-cap, bold, and underscored font omitted)).

The Amended Complaint further removes the allegation tha,t "[o]n or around October 25, 2022, an attorney representing Mrs. Wrenn contacted the City alleging stalking, harassment, and blackmail by Plaintiff. Chief Cole authorized an investigation into the allegations." (Docket Entry 1, ¶ 28; see Docket Entry 12, ¶ 28.) It similarly omits details regarding the reasons for Plaintiff's suspension without pay on December 7, 2022, and his placement on administrative leave in December 2022. (Compare Docket Entry 1, ¶¶ 34-36 (asserting, inter alia, that "Plaintiff was suspended without pay for five (5) shifts on December 7, 2022, for the false allegations that Mrs. Wrenn made against Plaintiff of stalking, harassment, and blackmail" and, "[f]rom December 7, 2022 through December 19, 2022, Plaintiff was placed on unpaid administrative leave during the internal affairs investigation regarding his prior relationship with Mrs. Wrenn"), with Docket Entry 12, ¶¶ 35-36 (omitting allegations regarding administrative

leave and nature of "false allegations").)  Finally, the Amended
Complaint adds allegations regarding communications between certain
Individual Defendants and Mrs. Wrenn and/or her husband, Jacob
Wrenn ("Mr. Wrenn," and collectively with Mrs. Wrenn, the "Wrenns")
(Docket Entry 12, ¶ 27), (compare id., ¶¶ 38, 44, 108, with Docket
Entry 1, ¶¶ 37-38, 42-43, 103-04), as well as allegations regarding
City Manager Garner's role in Plaintiff's termination (compare
Docket Entry 12, ¶ 52, with Docket Entry 1, ¶ 50) and her refusal
to speak with Plaintiff at some unspecified time, presumably during
the investigation that culminated in Plaintiff's employment
termination (compare Docket Entry 12, ¶ 109, with Docket Entry 1,
¶¶ 103-04).

Defendants moved to dismiss the Amended Complaint on the same
grounds as they moved to dismiss the Complaint.  (See Docket Entry
17 at 1-23.)  Plaintiff responded by purporting to dismiss his
Section 1983 claim (see Docket Entry 19 (the "Opposition") at 8),
but otherwise opposing the Motion (see id. at 1-22).

As relevant to the Motion, the Amended Complaint asserts:

At all relevant times, Plaintiff "was over the age of 40"
(Docket Entry 12, ¶ 7; accord id., ¶ 65); indeed, the City
apparently constitutes Plaintiff's "hometown of fifty (50) years"
(id., ¶ 95).  "On or around November 16, 1994, Plaintiff started
working with the City" (id., ¶ 11), and he "signed a contract of
employment with the City when he became an employee in 1994" (id.,

¶ 98).  In September 2003, Plaintiff "began working for the Fire Department."  (Id., ¶ 11.)  "Capt. Moore arrived at the Fire Department in May of 2020."  (Id., ¶ 12.)  Capt. Moore and Chief Cole "were supervisors of Plaintiff."  (Id., ¶ 105.)  "On or around May 30, 2020, a paramedic expressed her displeasure with Capt. Moore's actions on an automobile collision call.  The members of the Graham Fire Department apologized for his actions."  (Id., ¶ 13 (stray comma omitted).)  "Plaintiff was voted firefighter of the year in 2020."  (Id., ¶ 14.)  "On or around November 9, 2021, Plaintiff along with twenty (20) additional members of the City of Graham Fire Department, signed an EEOC protected complaint against Capt. Jason Moore for hostile work environment."  (Id., ¶ 15; see also id., ¶ 82 ("Plaintiff filed a complaint with the City of Graham along with his coworkers alleging that Capt. Moore created a hostile work environment, particularly against older more seasoned workers.").)

Of note:

> The complaint against Capt. Moore included, among other things: demanding, demeaning, condescending and aggressive behavior towards firefighters of the department; safety concerns around him, undermining firefighters during emergency calls; inappropriate behaviors towards EMS personnel, police, Alamance County Rescue, Fire Instructors, EMS instructors and other partners; harassment of older more seasoned members; creating and enforcing rules that he doesn't adhere to; disparate discipline of members based on age; and belittling employees in front of the team.

> The internal investigation of Capt. Moore was performed from November 9, 2021 to January 25, 2022.

7

> [Plaintiff] was a whistle blower along with the twenty-one (21) signees in the complaint against Capt. Moore. Most of these individuals are no longer with the fire department due to retaliation. They were disciplined and/or fired. Some quit, retired early, were fired or denied promotions.
>
> Capt. Moore created a hostile work environment and treated older more seasoned firemen worse than he did other employees. Capt. Moore was younger (under 40) than most of the tenured firemen and Moore had been unnecessarily aggressive, hostile, scrutinizing, and condescending towards employees. Fire Chief Cole endorsed Capt. Moore's behavior and allowed this behavior to continue.

(Id., ¶¶ 16-18 (internal paragraph numbering omitted).) "On or around January 25, 2022, the investigation into Capt. Moore concluded without any disciplinary action taken towards him." (Id., ¶ 19.)

"On or around May 3, 2022, Plaintiff, a Fire Equipment Operator (FEO) sent a complaint to Fire Chief Tommy Cole of the Graham Fire Department. This letter led to a meeting on May 16, 2022 with Plaintiff, Capt. Moore and Chief Cole, to discuss the written complaint that he had emailed to Chief Cole about Capt. Moore." (Id., ¶ 20.) In particular:

> During the May 16, 2022 meeting, Chief Cole asked Plaintiff to be a bridge between the rest of the department and Chief Cole and Capt. Moore. Plaintiff told him that probably wasn't going to be possible. Chief Cole responded in reference to his age. He said, "with your age and experience and the fact all these young guys come to you, I think you can help bring this department together."

8

(Id., ¶ 21.) "Plaintiff's age was a concern for Chief Cole as he thought that Plaintiff's age created influence over the young employees." (Id., ¶ 22.)

"In early May of 2022, Plaintiff along with his coworkers sent a complaint of no confidence regarding Chief Cole to the City" (id. ¶ 23) based on Chief Cole's "failure to take action against Capt. Moore" (id., ¶ 83). "[T]here were no signatures of the employees on the complaint against Chief Cole (id., ¶ 87), but at some unspecified time, "Chief Cole asked Plaintiff if he was the person behind the complaints against him and Capt. Moore." (Id., ¶ 78.) In any event, "Plaintiff participated in the investigation of the complaint against Chief Cole from May 2022 through August 2022." (Id., ¶ 24.) "On or around May 23, 2022, a notification was sent stating that the complaint was investigated by a neutral third party." (Id., ¶ 25.) "On or around May 27, 2022, a letter along with other pertinent information regarding the internal investigation of Capt. Jason Moore and the actions of the Fire Chief was mailed to all Council Members." (Id., ¶ 26.)

"On or around October 2, 2022, Plaintiff informed [Mrs.] Wrenn of his desire to end his relationship with her if she chose to remain married to her husband, [Mr.] Wrenn whom she claimed to be abusive." (Id., ¶ 27.) "On or around October 14, 2022, [Plaintiff] submitted his application for one (1) of the two (2) vacant captain positions. He was the most qualified for the

9

position but did not receive the position." (Id., ¶ 28.)
Additionally:

> In October 2022 Plaintiff advised Chief Cole that he was
> involved in an affair that had ended, and that the wife
> had threatened that her husband would do everything in
> his power to get him fired. [Plaintiff] also informed
> [Chief Cole] that: a) the wife was previously in an
> affair that ended in a murder-suicide in 2009, with the
> failed suicide attempt on her part; b) the wife attempted
> suicide again October 18, 2022; and c) he was extremely
> fearful of what measures this couple would take to have
> him fired.

(Id., ¶ 29.)  "On October 25, 2022, an internal affairs
investigation was opened against Plaintiff for an affair he had
with Mrs. Wrenn that occurred while he was off duty." (Id., ¶ 30.)

"On October 28, 2022 Mrs. Wrenn advised the City of Graham
Fire Department's Fire Chief, Defendant Cole and City of Graham
Investigator, Billy Clayton, that Plaintiff was responsible for the
whistleblower complaints against Chief Cole and Capt. Moore."
(Id., ¶ 31.)  "On October 28, 2022 Mrs. Wrenn also advised Chief
Cole and Investigator Billy Clayton that Plaintiff planned to
expose Chief Cole and City Manager Megan Garner in their direct
attempts to 'poison the well'." (Id., ¶ 32.)  "After Mrs. Wrenn's
involvement with the Plaintiff had been exposed in mid-October 2022, and
the involvement between these two parties had ended, Mrs. Wrenn willfully
and falsely misled her husband to believe she had been threatened and
forced to remain involved with Plaintiff for fear of retaliation."
(Id., ¶ 33.)  Thereafter:

> On his November 16, 2022 evaluation, Plaintiff was noted
> to have done a great job with organizing the room and ensuring

10

an accurate inventory for their current PPE on August 16. Even though Plaintiff had noted good performance, Capt. Moore gave him a drastically lower performance rating than he had received in previous years. Capt. Moore complimented him on being an excellent employee in 2020 and 2021. However, after Plaintiff participated in the investigations, Capt. Moore's overall comments were related to Plaintiff's age.

(Id., ¶ 34.)

"Subsequently, Plaintiff was suspended without pay for five (5) shifts on December 7, 2022, for his prior relationship with Mrs. Wrenn and the false allegations she made against him." (Id., ¶ 35.) "On or around December 19, 2022, Plaintiff learned that he was denied the promotion to one (1) of the captain positions." (Id., ¶ 36.) "The persons selected for the captain positions were not signatories to the complaint against Capt. Moore." (Id., ¶ 86.) "On or around December 19, 2022, Plaintiff was placed on probation for one (1) year as a result of the investigation." (Id., ¶ 37.)

A short time later:

On or around January 5, 2023, Mr. Wrenn emailed Chief Cole calling for Plaintiff's termination and stating "Chief I know you're in a hard spot staffing but also know this is the individual that has tried to take you out because you thankfully disrupted the system there, and I can't imagine how this loose asset will benefit GFD in the long run at this point."

(Id., ¶ 38.) "On or around January 25, 2023, Chief Cole emailed a letter to Mr. Wrenn disclosing the personnel disciplinary decisions the City made regarding Plaintiff's employment. In the email, Chief Cole also solicited additional information that could assist the City in terminating Plaintiff's employment." (Id., ¶ 39.) "Chief Cole met with Mr. Wrenn on several occasions to solicit information about Plaintiff." (Id., ¶ 40.) In addition:

11

> On or around March 29, 2023, Plaintiff's captain learned
> through Chief Cole that . . . [P]laintiff was being stalked by
> Mr. and Mrs. Wrenn and insisted that Chief Cole inform . . .
> [P]laintiff. Also, the Wrenn's [sic] had been providing Chief
> Cole with videos and photos of Plaintiff and those of his
> romantic interest at various locations in their community over
> a period of several months.

(Id., ¶ 41.)

"On or around March 31, 2023, Mrs. Wrenn filed a Civil Domestic

Violence Protective Order Complaint (DVPO) and Ex Parte Order against

Plaintiff." (Id., ¶ 42.) "On or around March 31, 2023, Megan Garner,

Graham City Manager, called Mrs. Wrenn to meet with her, discuss

Plaintiff and get a copy of the DVPO Complaint and Ex Parte Order."

(Id., ¶ 43.) From that point:

> There were numerous emails and at least ten (10) phone
> calls between Ms. Garner and Mrs. Wrenn that lasted at a
> minimum of two (2) hours and thirty (30) minutes while
> Plaintiff was employed by the City. There were at least an
> additional ten (10) phone calls between Ms. Garner and Mrs.
> Wrenn after he was terminated and prior to Plaintiff's appeals
> hearing regarding his termination.

> On or around April 3, 2023, another internal affairs
> investigation was opened against Plaintiff at the request of
> Mr. and Mrs. Wrenn in violation of his due process. This
> investigation also had nothing to do with his job performance.
> He was denied an attorney, was not provided any evidence and
> was threatened by the Fire Department leadership.

(Id., ¶¶ 44-45 (internal paragraph numbering omitted).) At some

unspecified time, City Manager "Garner refused to speak with Plaintiff

and gave him the reason that she couldn't get involved because she was

his appeals person. However, she engaged in numerous lengthy phone calls

with Mrs. Wrenn." (Id., ¶ 109.) "Mr. Wrenn and Investigator Billy

Clayton engaged in unlawful surveillance of Plaintiff while off duty.

As a result, Plaintiff filed a police report for stalking and harassment

by the Wrenn family." (Id., ¶ 46.)

12

"During April of 2023, Plaintiff was called into interrogations and hearings and was denied an attorney." (Id., ¶ 47.) "Plaintiff was put through an estimated 7-10 combined hours of hostile interviews. This was accompanied by an attempt to coerce the Plaintiff into a confession with threats of being arrested and the loss of employment." (Id., ¶ 48.) "On or around April 5, 2023, Mrs. Wrenn attempted to press criminal charges against Plaintiff with the Alamance County Sheriff's Office. After reviewing the information, they did not find probable cause and declined to press charges." (Id., ¶ 49.) "On or around May 8, 2023, Mrs. Wrenn dismissed her DVPO Complaint against Plaintiff during the trial." (Id., ¶ 50.)

"Plaintiff received a pre-disciplinary conference notice on May 10, 2023. He was denied an attorney again. He filed a formal complaint against Fire Chief Tommy Cole for retaliation with the City Manager, Megan Garner." (Id., ¶ 51.) Nonetheless:

> On May 17, 2023, Plaintiff was placed on paid administrative leave and was terminated via email after 8:00 pm that evening. Mrs. Wrenn was contacted that same day by the City of Graham and advised of his termination. He appealed the termination. [City Manager] Garner was the person who presided over his appeals hearing and made the decision to uphold his termination.

(Id., ¶ 52.) At the time of "his termination, Plaintiff was the second longest tenured employee at the City." (Id., ¶ 53.) "Plaintiff requested a name clearing hearing with the HR Director in May 28, 2023. The termination notices were placed in his file which made them public record prior to him being given a name clearing hearing. Plaintiff was not offered a name clearing until July of 2023." (Id., ¶ 54.)

13

"On around May 26, 2023, Mrs. Wrenn filed another Complaint for a DVPO under the same or similar set of facts in Alamance County District Court.  The Ex Parte Order was denied by the [c]ourt."  (<u>Id.</u>, ¶ 55.)  "On or around August 28, 2023, Mrs. Wrenn's Complaint was dismissed by the [c]ourt for failure to prove grounds for issuance of a domestic violence protective order."  (<u>Id.</u>, ¶ 56.)  "The [c]ourt found that Mrs. Wrenn made multiple calls to Plaintiff placed from multiple avenues between October 12, 2022 and October 19, 2022 and that the [c]ourt did not believe the relationship had ended at that time."  (<u>Id.</u>)

"Plaintiff was replaced by younger employees."  (<u>Id.</u>, ¶ 69.)  "Since the terminations, forced resignations and departures of the fire department, the fire department is currently made up of persons in their twenties (20s)."  (<u>Id.</u>, ¶ 70.)

## DISCUSSION

### I. Rule 12(b)(6) Standards

A Rule 12(b)(6) motion "tests the sufficiency of a complaint," but "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  <u>Republican Party of N.C. v. Martin</u>, 980 F.2d 943, 952 (4th Cir. 1992).  Accordingly, in reviewing a Rule 12(b)(6) motion, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff."  <u>Coleman v. Maryland Ct. of App.</u>, 626 F.3d 187, 189 (4th Cir. 2010), <u>aff'd sub nom.</u>, <u>Coleman v. Court of App. of Md.</u>, 566 U.S. 30 (2012).  The Court must also "draw all <u>reasonable</u> inferences in favor of the plaintiff."  <u>E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.</u>, 637 F.3d 435, 440 (4th Cir. 2011) (emphasis added) (internal quotation marks

14

omitted). Nevertheless, the Court "will not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc., 707 F.3d 451, 455 (4th Cir. 2013) (internal quotation marks omitted). The Court can also "put aside any naked assertions devoid of further factual enhancement." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015), as amended on reh'g in part (Oct. 29, 2015) (internal quotation marks omitted).

To avoid Rule 12(b)(6) dismissal, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. See id. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id.

In other words, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Moreover, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint" cannot "survive a Rule 12(b)(6) motion." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir.

15

2009) (internal quotation marks omitted). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Id. (quoting Iqbal, 556 U.S. at 679).

Finally, in ruling on a Rule 12(b)(6) motion, "a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont, 637 F.3d at 448. The Court may also consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

## II. Preliminary Matters

As an initial matter, "[i]t is well-established that parties cannot amend their complaints through briefing," Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013). Thus, the Opposition cannot by itself dismiss Plaintiff's Section 1983 claim. (See Docket Entry 19 at 8.) Nevertheless, through the Opposition, Plaintiff both abandoned his Section 1983 claim and failed to respond to Defendants' arguments regarding the necessity of its dismissal (see Docket Entry 17 at 6-7). (See Docket Entry 19 at 1-22.) The Court should therefore dismiss Plaintiff's Section 1983 claim. See, e.g., Kinetic Concepts, Inc. v. Convatec Inc., No. 1:08cv918, 2010 WL 1667285, at *8 (M.D.N.C. Apr. 23, 2010) (explaining that "a party who fails to address an issue has conceded the issue") (collecting cases).

16

Moreover, "Title VII and the ADEA do not provide a cause of action against co-employees or supervisors; the cause of action is against the employer." Rageh v. University of N.C., No. 1:24cv336, 2024 WL 5056448, at *2 (M.D.N.C. Dec. 10, 2024). Thus, to the extent Plaintiff attempts to assert ADEA and/or Title VII claims against Individual Defendants (see Docket Entry 12 at 10-13 (failing to specify target of claims)), such claims fail. Further, although Plaintiff purports to pursue his retaliation claims pursuant to "42 U.S.C. § 2000e-3" (id. at 12-13 (bold and underscored font omitted)), the antiretaliation provisions of Title VII, see 42 U.S.C. § 2000e-3(a), the Amended Complaint does not implicate Title VII, which proscribes employment discrimination "because of [an] individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1). (See generally Docket Entry 12 (asserting solely age-based discrimination).) Instead, the Court should treat Plaintiff's claims as arising under the ADEA's antiretaliation provision, 29 U.S.C. § 623(d).[3]

Finally, "[o]fficial-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent." Kentucky v. Graham, 473 U.S. 159, 165 (1985); see also id.

---

[3] This clarification does not impact resolution of the Motion. Given the statutory similarities between Title VII and the ADEA, the same elements apply to retaliation claims under both statutes, see Rageh, 2024 WL 5056448, at *5, and courts generally look to Title VII case law in analyzing ADEA claims, see, e.g., Blistein v. St. John's Coll., 860 F. Supp. 256, 268 n.16 (D. Md. 1994) ("[T]he non-retaliation provisions of Title VII and the ADEA are nearly identical; therefore this Court believes that the Title VII retaliation decisions of the [United States Court of Appeals for the] Fourth Circuit are applicable.").

17

at 166 ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity." (emphasis in original) (citation omitted)). Plaintiff's claims against Individual Defendants in their official capacities qualify as redundant of his claims against the city, warranting their dismissal. See, e.g., Armstrong v. City of Greensboro, 190 F. Supp. 3d 450, 462-63 (M.D.N.C. 2016) (explaining that "duplicative claims against an individual in his official capacity when the government entity is also sued may be dismissed") (collecting cases); see also Rageh, 2024 WL 5056448, at *2 (noting that "[t]he Title VII and ADEA claims against the individual defendants in their official capacities are duplicative of the claims against UNC" and dismissing "the Title VII and ADEA claims against the individual defendants in both their official and individual capacities").

### III. ADEA Discrimination Claim

Plaintiff contends that Defendants terminated his employment because of his age. (See Docket Entry 12, ¶¶ 63-70; see also Docket Entry 19 at 8 (identifying "termination" as relevant "adverse employment action").) "For his age discrimination claim, [Plaintiff] must allege facts plausibly supporting the inference that (1) he was over the age of 40, (2) he experienced discrimination by an employer, and (3) the discrimination was because of his age." Rageh, 2024 WL 5056448, at *2 (internal quotation marks omitted). Notably, "the ADEA's text does not provide that a plaintiff may establish discrimination by showing that age

18

was simply a motivating factor.  Rather, the plaintiff retains the burden of persuasion to establish that age was the 'but-for' cause of the employer's adverse action." Palmer v. Liberty Univ., Inc., 72 F.4th 52, 67 (4th Cir. 2023), cert. denied sub nom. Liberty Univ., Inc. v. Bowes, 144 S. Ct. 1030 (2024), and cert. denied sub nom. Bowes Est. of Palmer v. Liberty Univ., Inc., 144 S. Ct. 1030 (2024) (internal quotation marks and citation omitted).  In other words, "the employee must prove that the employer would not have fired h[im] in the absence of age discrimination, not prove that age was one of multiple motives for the adverse employment decision." Id. (internal quotation marks omitted).  Nevertheless, "a plaintiff need not establish but-for causation to survive a motion to dismiss.  Rather, a plaintiff need only plead sufficient facts to plausibly support a claim of discrimination." Lattinville-Pace v. Intelligent Waves LLC, No. 22-1144, 2024 WL 1756167, at *1 (4th Cir. Apr. 24, 2024), cert. denied, 145 S. Ct. 274 (2024).  Plaintiff fails to satisfy this standard.

Here, the Amended Complaint alleges that, during all relevant events, Plaintiff "was over the age of 40" (Docket Entry 12, ¶ 7), including when he "was voted firefighter of the year in 2020" (id., ¶ 14), following Capt. Moore's arrival (see id., ¶ 12).  The Amended Complaint further alleges that "Capt. Moore complimented [Plaintiff] on being an excellent employee in 2020 and 2021." (Id., ¶ 34.)  Moreover, although the Amended Complaint asserts that, at his evaluation on November 16, 2022, "Capt. Moore's overall comments were related to Plaintiff's age" (id.), it provides no details regarding the nature of those comments (see id.).  Indeed, the only non-conclusory age-

19

related factual allegations in the Amended Complaint indicate that Plaintiff's superior(s) perceived his age as an asset in resolving workplace tensions (see id., ¶ 21 ("Chief Cole asked Plaintiff to be a bridge between the rest of the department and Chief Cole and Capt. Moore" at a May 2022 meeting, explaining that "'with [Plaintiff's] age and experience and the fact all these young guys come to [Plaintiff], [Chief Cole] think[s Plaintiff] can help bring this department together'")). In any event, the Amended Complaint reveals that Plaintiff experienced his termination (and non-promotion) only after the revelation of his affair with a married woman and the volatile aftermath of the cessation of that affair, which involved allegations of violence and criminally inappropriate conduct by Plaintiff and other community members (see, e.g., Docket Entries 12-2 to 12-4 (confirming the Wrenns' status as members of City community)). These circumstances render implausible any notion that age bias motivated Defendants' termination of Plaintiff's employment, necessitating dismissal of Plaintiff's ADEA discrimination claim.

### IV. ADEA Hostile Work Environment Claim

Plaintiff further contends that Capt. Moore inflicted an age-based hostile work environment on Plaintiff. (See Docket Entry 12, ¶¶ 72-75.) "Before a plaintiff may file suit under Title VII or the ADEA, he is required to file a charge of discrimination with the EEOC," which, as relevant here, must be filed within "180 days after the alleged unlawful employment practice." Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009), abrogated by Fort Bend Cnty., Texas v. Davis, 587 U.S. 541 (2019). When a plaintiff asserts a hostile work environment claim,

20

the "[C]ourt's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period." National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 120 (2002). Defendants maintain that Plaintiff's hostile work environment claim fails as untimely because "[t]he only allegations in the Amended Complaint regarding a 'hostile work environment' occurred in November 2021," long before Plaintiff filed his EEOC charge on May 16, 2023. (Docket Entry 17 at 14 (citing Docket Entry 12, ¶¶ 16, 72).) The complaint Plaintiff and his coworkers made in November 2021 clearly occurred more than 180 days prior to the filing of this charge, as does Plaintiff's evaluation on November 16, 2022, wherein Capt. Moore allegedly issued some unknown comments regarding Plaintiff's age. As such, Plaintiff's hostile work environment claim appears untimely, notwithstanding the Opposition's assertion (without citation to allegations in the Amended Complaint) that "the hostile work environment continued and did not end until Plaintiff was terminated" (Docket Entry 19 at 14).

Even if the Court treated Plaintiff's hostile work environment claim as timely, it still falls short. "A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment." Guluma v. DeJoy, Civ. Action No. 20-3588, 2022 WL 1642261, at *7 (D. Md. May 24, 2022) (internal quotation marks and brackets omitted) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "To state a hostile work environment claim, a

plaintiff must allege (1) unwelcome conduct; (2) that is based on the plaintiff's [age]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive environment; and (4) which is imputable to the employer." Id. (internal quotation marks omitted). "Harassment is 'based on' [a protected characteristic] when an employee would not have experienced the harassment 'but for' h[is] protected characteristic." Seabrook v. Driscoll, 148 F.4th 264, 271 (4th Cir. 2025). As the Fourth Circuit recently explained:

> Regarding the third element, whether the environment is objectively hostile or abusive is judged from the perspective of a reasonable person in the plaintiff's position. That determination is made by looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Rude treatment, callous behavior, or routine difference of opinion and personality conflict, without more, will not suffice.

Id. at 272 (internal quotation marks, brackets, and citations omitted).

The Amended Complaint contains only conclusory assertions of age-related discriminatory conduct, amid a litany of other objections regarding Capt. Moore's management style. (See, e.g., Docket Entry 12, ¶ 72.) That approach dooms Plaintiff's hostile work environment claim. See, e.g., Amis v. Pekoske, No. 3:20cv541, 2021 WL 783543, at *4 (W.D.N.C. Mar. 1, 2021) (dismissing discrimination claim where "the [c]omplaint simply states legal conclusions and provides a formulaic recitation of the elements necessary to state an ADEA claim"), aff'd sub nom. Amis v. Mayorkas, No. 21-1544, 2022 WL 1090252 (4th Cir. Apr. 12, 2022); see also Seabrook, 148 F.4th at 272 (concluding that plaintiff

22

failed to state a Title VII hostile work environment claim where "[n]one of the actions she identifies are objectively abusive, humiliating, or physically threatening," but "instead reflect a difference of opinion about how to discipline [another individual] and the steps taken to investigate [the plaintiff's] negative leadership and execute her own discipline," explaining that "[t]he [employer's] alleged behavior does not rise to an objective level of abuse sufficient to sustain a hostile work environment claim"). Accordingly, the Court should dismiss Plaintiff's hostile work environment claim.

## **V. ADEA Retaliation Claims**

Plaintiff next asserts that Defendants failed to promote him and fired him in retaliation for his complaints against Capt. Moore and Chief Cole. (See Docket Entry 12, ¶¶ 77-89.) "To plead a Title VII or ADEA retaliation claim, the complaint must allege facts supporting a plausible inference that the employer took an adverse employment action against the plaintiff because of the plaintiff's protected activity." Rageh, 2024 WL 5056448, at *5 (internal quotation marks omitted). In other words, "a plaintiff must allege (1) that he engaged in protected activity; (2) that his employer took an adverse action against him; and (3) that a causal connection existed between the adverse activity and the protected action." Amis v. Mayorkas, No. 21-1544, 2022 WL 1090252, at *2 (4th Cir. Apr. 12, 2022) (internal quotation marks omitted). "A plaintiff may attempt to demonstrate that a protected activity caused an adverse action through two routes. First, a plaintiff may establish that the adverse act bears sufficient temporal proximity to the protected activity." Id. However, "[w]here a plaintiff rests his case on

23

temporal proximity alone, the temporal proximity must be very close." Penley v. McDowell Cnty. Bd. of Educ., 876 F.3d 646, 656 (4th Cir. 2017). "Second, a plaintiff may establish the existence of other facts that suggest the adverse employment action occurred because of the protected activity." Amis, 2022 WL 1090252, at *2. Ultimately:

> In determining whether a plaintiff engaged in protected oppositional activity, the touchstone is whether the plaintiff's course of conduct as a whole (1) communicates to h[is] employer a belief that the employer has engaged in a form of employment discrimination and (2) concerns subject matter that is actually unlawful under [the ADEA] or that the employee reasonably believes to be unlawful.

Powell v. Nash Edgecombe Econ. Dev., Inc., No. 5:20cv562, 2021 WL 1736894, at *6 (E.D.N.C. May 3, 2021) (analyzing Title VII retaliation claim) (emphasis in original) (internal quotation marks omitted). Moreover, the "protected oppositional activity must bring attention to an employer's discriminatory activities." Id. at *7 (emphasis in original) (internal quotation marks omitted); see also id. ("Title VII is not a general bad acts statute, and it does not prohibit private employers from retaliating against an employee based on her opposition to practices that are outside the scope of Title VII." (brackets and internal quotation marks omitted)).

Here, the Amended Complaint links (albeit in conclusory fashion) only the November 2021 complaint against Capt. Moore to age-based discriminatory conduct. (See Docket Entry 12, ¶ 16; see also id., ¶¶ 20-21 (indicating Plaintiff submitted second complaint against Capt. Moore but providing no details regarding its content), 83 (indicating no confidence complaint against Chief Cole involved his "failure to take action against Capt. Moore").) Plaintiff submitted that complaint more

24

than a year before his non-promotion and more than eighteen months before his termination. Moreover, the ensuing investigation into that complaint terminated more than eight months before Plaintiff even applied for the captain position and more than fifteen months before his termination. Such a lengthy period between protected activity and adverse action "is simply not a sufficient basis for a reasonable inference of causation." Penley, 876 F.3d at 656 (brackets and internal quotation marks omitted) (describing action "eight to nine months prior" as "not very close" (internal quotation marks omitted)); see also King v. Rumsfeld, 328 F.3d 145, 151 n.5 (4th Cir. 2003) ("[The plaintiff's] firing came two months and two weeks following [his supervisor's] receipt of notice that [the plaintiff] had filed an EEO complaint . . . . This length of time between [the supervisor's] notice of the complaint and the adverse employment action is sufficiently long so as to weaken significantly the inference of causation between the two events."); Wilson v. UNC Health Care Sys., No. 1:19cv1169, 2020 WL 5764368, at *8 (M.D.N.C. Sept. 28, 2020) ("This three-month gap, particularly given the crucial intervening event which triggered termination, undermines [the p]laintiff's attempt to causally connect this particular warning with his termination.").

Further, months after the investigations into all three complaints finished and mere days after applying for the captain position, Plaintiff disclosed his involvement in an extramarital affair, informing Chief Cole that "a) the wife was previously in an affair that ended in a murder-suicide in 2009, with the failed suicide attempt on her part; b) the wife attempted suicide again October 18, 2022; and c) [Plaintiff] was extremely fearful of what measures this couple would take to have him

25

fired." (Docket Entry 12, ¶ 29; see id., ¶ 28.) The Amended Complaint and its exhibits reveal that the aftermath of this affair, which continued through Plaintiff's termination, involved allegations of violence and illegal conduct by both Plaintiff and the Wrenns, necessitating the involvement of local law enforcement and local courts. (See id., ¶¶ 29-56; see also Docket Entries 12-2 to 12-4.) These circumstances render implausible any notion that Plaintiff's non-promotion and termination occurred in retaliation for any age-based discrimination complaints by Plaintiff.

> Put simply:
>
> A plaintiff must provide objective facts or dates linking his termination[ or non-promotion] to his protected conduct other than his own opinions about a supervisor's motives. Plaintiff provides only his own opinions about the cause of his termination[ and non-promotion], with objective facts and dates that do not align with retaliation as a plausible motive. Thus, Plaintiff falls short of alleging facts sufficient for a retaliation case . . . .
>
> [Accordingly,] th[e C]ourt [should] dismiss [Plaintiff's retaliation] claim[s] due to failure to state a claim under [Rule] 12(b)(6).

Wilson, 2020 WL 5764368, at *8 (brackets and internal quotation marks omitted).

### VI. Wrongful Discharge Claim

Under North Carolina law,

> "[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain[,] and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

N.C. Gen. Stat. § 143-422.2(a) (the "NCEEPA"). Further, North Carolina recognizes an exception to the at-will employment doctrine (discussed

26

below) "when an employee is discharged in contravention of public policy." Alderman v. Inmar Enters., Inc., 201 F. Supp. 2d 532, 546 (M.D.N.C. 2002), aff'd, 58 F. App'x 47 (4th Cir. 2003). When a party asserts age-based discrimination under the NCEEPA, the ADEA standards apply. See id.; see also Powell, 2021 WL 1736894, at *8 ("[T]he standards applicable to an ADEA claim also govern claims of age discrimination under NCEEPA."). Because Plaintiff's ADEA claims fail, "and Plaintiff's ADEA claim[s] and Plaintiff's state law [wrongful discharge] claim are based upon the same factual allegations and subject to the same [dismissal] standards, the Court [should] also [dismiss] . . . Plaintiff's state law claim for wrongful termination." Alderman, 201 F. Supp. 2d at 546-47; see also Powell, 2021 WL 1736894, at *8 ("Accordingly, for the same reasons that the court grants [the] defendant's motion to dismiss [the plaintiff's] Title VII and ADEA claims, the court grants [the] defendant's motion to dismiss [the plaintiff's] wrongful termination claim.").

## VII. Breach of Contract Claims

Under North Carolina law, "the elements of a claim of breach of contract are (1) existence of a valid contract and (2) breach of that contract." Poor v. Hill, 138 N.C. App. 19, 29, 530 S.E.2d 838, 845 (2000). Importantly, though,

> North Carolina is an employment-at-will state. Th[e North Carolina Supreme] Court has repeatedly held that in the absence of a contractual agreement between an employer and an employee establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party without regard to the quality of performance of either party.

Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997) (emphasis added); see also id. at 332, 493 S.E.2d at 422 (explaining that "assurances of continued employment," by themselves, do not suffice "to create an employment contract for a definite term," as well as "that a contract for 'a regular permanent job' is not sufficiently definite to remove the employment relationship from the at-will presumption"); Bethel v. Federal Express Corp., No. 1:09cv613, 2010 WL 3242651, at *8 (M.D.N.C. Aug. 16, 2010) ("In order to support a breach of contract claim, even oral promises of employment must set forth a definite term of employment."). Here, the Amended Complaint alleges only that "Plaintiff signed a contract of employment with the City when he became an employee in 1994." (Docket Entry 12, ¶ 98.) This bare-bones allegation fails to establish that Plaintiff entered into a contract with the City for a definite term of employment, as required to escape the at-will employment presumption. In turn, the at-will employment doctrine defeats Plaintiff's breach of contract claim. See Kurtzman, 347 N.C. at 331, 493 S.E.2d at 422.

Given that the Amended Complaint establishes nothing beyond an at-will employment relationship, Plaintiff cannot maintain a claim for breach of the implied duty of good faith and fair dealing (see Docket Entry 12, ¶ 114 ("[The City] breached its implied duty of good faith and fair dealing in their [sic] dealings with [P]laintiff in connection with the employment agreement.")). See Hardin v. Belmont Textile Mach. Co., No. 3:05cv492, 2006 WL 2229002, at *4 (W.D.N.C. Aug. 3, 2006) ("North Carolina law does not recognize a claim for wrongful discharge of an at-will employee based on an implied covenant of good faith and fair

28

dealing." (citing Salt v. Applied Analytical, Inc., 104 N.C. App. 652, 661, 412 S.E.2d 97, 102 (1991))); accord, e.g., Ramos v. AAA of Carolinas, No. 1:17cv58, 2017 WL 5896904, at *5 (W.D.N.C. Oct. 31, 2017), recommendation adopted, 2017 WL 5894185 (W.D.N.C. Nov. 29, 2017); Curran v. First Union Mortg. Corp., No. 5:95cv975, 1997 WL 907909, at *2 (E.D.N.C. Mar. 24, 1997); Connolly v. Fieldcrest Cannon, Inc., No. 2:93cv209, 1994 WL 752149, at *1 (M.D.N.C. June 27, 1994); see also Bethel, 2010 WL 3242651, at *11 (explaining, inter alia, that "North Carolina law does not recognize a wrongful discharge in bad faith claim for at-will employees").

The Court should therefore dismiss Plaintiff's breach of contract claims.

## VIII. Tortious Interference with Contract

North Carolina law recognizes a claim for tortious interference with contract, even in the context of at-will employment. See Combs v. City Elec. Supply Co., 203 N.C. App. 75, 83–84, 690 S.E.2d 719, 725 (2010) (collecting cases). In that regard:

> There are five essential elements for an action for malicious interference with contract: (1) a valid contract existed between plaintiff and a third person, (2) defendant knew of such contract, (3) defendant intentionally induced the third person not to perform his or her contract with plaintiff, (4) defendant had no justification for his or her actions, and (5) plaintiff suffered damage as a result.

Wagoner v. Elkin City Schs.' Bd. of Educ., 113 N.C. App. 579, 587, 440 S.E.2d 119, 124 (1994).

"Whether an actor's conduct is justified depends upon the circumstances surrounding the interference, the actor's motive or conduct, the interests sought to be advanced, the social interest in

29

protecting the freedom of action of the actor, and the contractual interests of the other party." Gilreath v. Cumberland Cnty. Bd. of Educ., No. COA16-927, 253 N.C. App. 238, 798 S.E.2d 438 (table), 2017 WL 1381652, at *8 (Apr. 18, 2017) (brackets and internal quotation marks omitted) (quoting Embree Constr. Grp., Inc. v. Rafcor, Inc., 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992)). "For claims of tortious interference with a contract, North Carolina makes a distinction between defendants who are 'outsiders' and 'non-outsiders' to the contract." Id. at *9 (certain internal quotation marks omitted). "An outsider is one who was not a party to the terminated contract and who had no legitimate business interest of his own in the subject matter thereof." Id. (internal quotation marks omitted). "Conversely, one who is a non-outsider is one who, though not a party to the terminated contract, had a legitimate business interest of his own in the subject matter." Id. (internal quotation marks omitted).

"Non-outsiders often enjoy qualified immunity from liability for inducing their corporation or other entity to breach its contract with an employee." Id. (brackets and internal quotation marks omitted). "[I]n order to hold a 'non-outsider' liable for tortious interference with contract, a plaintiff must establish that the defendant acted with legal malice, that he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties." Id. (certain internal quotation marks omitted); see also Pinewood Homes, Inc. v. Harris, 184 N.C. App. 597, 605, 646 S.E.2d 826, 832-33 (2007) (explaining that "a complaint [for tortious interference] must admit of no motive for interference other than malice"); Varner v.

30

<u>Bryan</u>, 113 N.C. App. 697, 702, 440 S.E.2d 295, 298 (1994) ("It is not enough, however, to show that a defendant acted with actual malice; the plaintiff must forecast evidence that the defendant acted with legal malice.").[4]

Thus, to "successfully assert[] a claim for tortious interference against a non-outsider[, a plaintiff must] allege[] that the defendant acted with malice and without a legitimate purpose." <u>Gilreath</u>, 2017 WL 1381652, at *9. As such, "[a] claim for tortious interference with an employment contract may generally be brought only against a corporate 'outsider,' because corporate insiders have 'a qualified privilege to interfere with contractual relations between the corporation and a third party.'" <u>Robinson v. Procter & Gamble Mfg. Co.</u>, No. 1:18CV133, 2019 WL 1005504, at *8 (M.D.N.C. Mar. 1, 2019).

Here, Plaintiff asserts tortious interference with contract claims against his supervisors and the City's manager, who upheld the termination decision. (<u>See</u> Docket Entry 12, ¶¶ 6, 52, 104-12.) Specifically, Plaintiff asserts that Capt. Moore and Chief Cole "intentionally interfered with Plaintiff's regular course of work, discriminating against Plaintiff and holding him to a different standard

---

4 As the North Carolina Supreme Court has explained:

> Indeed, actual malice and freedom from liability for this tort may coexist. If the outsider has a sufficient lawful reason for inducing the breach of contract, he is exempt from liability for so doing, no matter how malicious in actuality his conduct may be. A "malicious motive makes a bad act worse, but it cannot make that wrong which, in its own essence, is lawful."

<u>Childress v. Abeles</u>, 240 N.C. 667, 675, 84 S.E.2d 176, 182 (1954).

31

than that of younger employees" (id., ¶ 106) and that Chief Cole and City Manager Garner "intentionally interfered with Plaintiff's employment by soliciting information from Mr. and Mrs. Wrenn to get Plaintiff fired" (id., ¶ 107). As an initial matter, all three Individual Defendants qualify as non-outsiders for purposes of this claim. In addition, for the reasons previously discussed, the Amended Complaint does not plausibly allege that discriminatory conduct by Capt. Moore and/or Chief Cole prompted the City's termination of Plaintiff's employment, precluding any tortious interference claim on this basis. Finally, the Amended Complaint establishes that Chief Cole and City Manager Garner possessed a legitimate interest in investigating the Wrenns' allegations against Plaintiff, a City firefighter. (See, e.g., id., ¶¶ 29-30, 38-45.) Because "the tortious interference allegations against [Individual Defendants] suggest motives other than malice," Individual Defendants are "properly afforded qualified immunity as . . . corporate insider[s]," warranting dismissal of Plaintiff's tortious interference claims against them. Robinson, 2019 WL 1005504, at *8.

## IX. Final Matters

In sum, Plaintiff's claims against Defendants fail as a matter of law, necessitating their dismissal. Defendants ask that such dismissal occur with prejudice. (See, e.g., Docket Entry 16 at 1.) Given the nature of the deficiencies and the fact that Plaintiff already filed an Amended Complaint in response to Defendants' first motion to dismiss, which largely identified the same deficiencies as the Motion, the Court should grant Defendant's request and dismiss Plaintiff's claims with prejudice. See, e.g., Blackford-Webb v. Glob. Scholars Acad., No.

1:24cv1071, 2025 WL 2532793, at *11 (M.D.N.C. Sept. 3, 2025) (recommending dismissal of Title VII claims with prejudice where plaintiff failed to address identified deficiencies in subsequent filing).

### CONCLUSION

Plaintiff's claims fail as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Motion (Docket Entry 16) be granted and Plaintiff's Amended Complaint be dismissed with prejudice.

This 15th day of September, 2025.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
